**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Lion Electric Company, | No. CV-23-00372-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Nikola Corporation, | |
| Defendant. | |

On April 6, 2023, Defendant Nikola Corporation moved to stay this litigation pending resolution of an expedited arbitration between Plaintiff The Lion Electric Company and Defendant's wholly owned subsidiary.  Doc. 11.  On May 15, 2023, Defendant moved to dismiss the complaint for failure to state a claim.  Doc. 26.  The motions are fully briefed and no party requests oral argument.  For reasons set forth below, the Court will deny the motions.

## I.    Background.

According to Plaintiff's complaint, this case involves direct competitors offering similar electric vehicles.  Doc. 1 ¶ 3.  Plaintiff is a Canadian corporation that designs and manufactures electric medium- and heavy-duty commercial vehicles.  *Id.* ¶ 1.  Defendant manufactures electric heavy-duty commercial vehicles.  *Id.* ¶ 2.  Defendant is a Delaware corporation headquartered in Phoenix, Arizona.  *Id.*  The parties power their vehicles with rechargeable lithium-ion batteries manufactured by Romeo Systems, Inc.  *Id.* ¶ 7.

On November 2, 2020, Plaintiff entered into a Purchase Agreement with Romeo. *Id.* ¶ 10; Doc. 1-2. The Agreement required Romeo to manufacture and deliver custom batteries to Plaintiff for its new vehicle, the Lion8T. Doc. 1 ¶¶ 9-10. Plaintiff agreed to purchase a minimum quantity of batteries, valued at $234 million. *Id.* ¶ 14. Romeo could reject purchase orders only in the event of termination of the Agreement. *Id.*

The Agreement included a pricing schedule with price ceilings. *Id.* The Agreement also provided:

> [Romeo] shall, at [Romeo's] sole cost and expense, take such actions as are necessary or appropriate to ensure the uninterrupted supply of Goods to [Plaintiff] during any foreseeable or anticipated event or circumstance that could interrupt or delay [Romeo's] performance under this Agreement[.]

Doc. 1-2 at 15. The Agreement was to remain in effect for five years from the start of production. Doc. 1 ¶ 10.

On May 10, 2022, Defendant initiated an acquisition of Romeo and began due diligence. *Id.* ¶ 23. Later that month, Romeo proposed selling Plaintiff an initial 40 batteries at the ceiling price and all additional batteries ordered through December 2023 at a price 65% higher. *Id.* ¶¶ 18, 20. Romeo's senior vice president of sales cited rising production costs. *Id.* ¶ 20. Plaintiff sought to enforce the ceiling price. *Id.* ¶¶ 19-20.

On August 1, 2022, Defendant announced its $144 million acquisition of Romeo as a wholly owned subsidiary. *Id.* ¶¶ 24-25. Defendant's chief executive officer stated that Defendant "need[ed] as many batteries as Romeo c[ould] produce" and was "not going to be a merchant of batteries." *Id.* ¶ 25.

Defendant's chief financial officer predicted that Defendant's gross profit margin would be impacted by "existing Romeo customer contract runoff" in the third and fourth quarters of 2022. *Id.* ¶ 26. Defendant also acknowledged, in a form filed with the U.S. Securities & Exchange Commission, that Romeo lacked sufficient liquidity. *Id.* ¶ 27.

On August 12, 2022, Romeo informed Plaintiff that it could not fulfill Plaintiff's September 2022 order because of technical difficulties. *Id.* ¶¶ 28-30. In October, Plaintiff requested documentation of the technical difficulties, and in November sought an on-site

2

audit of Romeo's facilities pursuant to the Agreement. *Id.* ¶¶ 31, 36. Romeo never provided the requested documents and did not respond to the audit request. *Id.* ¶¶ 32, 36.

Defendant's acquisition of Romeo was finalized on October 14, 2022. *Id.* ¶ 33. On December 7, 2022, Romeo terminated the Purchase Agreement with Plaintiff, citing technical difficulties. *Id.* ¶ 37.

Plaintiff claims that it cannot produce more than 100 Lion8T vehicles because of Defendant's orchestration of Romeo's May 2022 refusal to honor the ceiling price and its contractual obligations (*id.* ¶ 23), Defendant's instruction that Romeo cite technical difficulties as the reason for the price increase in August 2022 (*id.* ¶¶ 28-30), and Defendant's direction that Romeo send the termination notice (*id.* ¶ 37). Plaintiff asserts claims for tortious interference with contractual relations and business expectancy (*id.* ¶¶ 40-51) and seeks unspecified compensatory and punitive damages. *Id.* at 17.

## II.    Motion to Dismiss.

### A.    Legal Standard.

Under Rule 12(b)(6), the well-pled factual allegations of the complaint are taken as true and construed in the light most favorable to Plaintiff. *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

### B.    Tortious Interference with Contract.

To state a claim for intentional interference with contract under Arizona law, a plaintiff must allege "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the [interferer], (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and

1   (5) that the defendant acted improperly." *Wells Fargo Bank v. Ariz. Laborers, Teamsters*

2   *& Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 31 (Ariz. 2002) (citing

3   Restatement (Second) of Torts § 766).  Defendant argues that Plaintiff fails to show the

4   fifth element.  Doc. 26 at 7-11.

5         To show improper conduct, a complaint must allege that the defendant's actions

6   were "wrongful by some measure beyond the fact of the interference itself." *Snow v. W.*

7   *Sav. & Loan Ass'n*, 730 P.2d 204, 212 (Ariz. 1986) (citation omitted).  Put differently, a

8   complaint must show that the defendant's conduct was motivated by ill will, undertaken in

9   bad faith, or otherwise was contrary to public policy.  Restatement (Second) of Torts § 767,

10   cmt. d.

11         The Arizona Supreme Court has adopted seven factors for assessing whether

12   conduct is improper: (1) the nature of the defendant's conduct, (2) the defendant's motive,

13   (3) the plaintiff's interests with which the defendant's conduct interferes, (4) the interests

14   sought to be advanced by the defendant, (5) the social interests in protecting the defendant's

15   freedom of action and the plaintiff's contractual interests, (6) the proximity of the

16   defendant's conduct to the interference, and (7) the relationship between the parties.

17   *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1042 (Ariz. 1985).

18         Defendant argues that Plaintiff cannot show improper conduct because Defendant,

19   as Romeo's parent company, was "privileged" to interfere with the Agreement.  Doc. 26

20   at 8-11.  Defendant urges the Court to adopt the "parent company privilege" that shields

21   parent companies from liability for interfering with contracts of subsidiaries that threaten

22   a shared economic interest.  *Id.*[1]  Defendant cannot prevail on this argument for two

23   reasons.

24

25

26        [1] The parent company privilege is also referred to as the affiliate privilege. Defendant cites cases using each term. *See* Doc. 26 at 9 (citing *Operation: Heroes, Ltd. v.*

27   *Procter & Gamble Prods., Inc.*, No. 2:12-cv-00214-RFB-GWF, 2015 WL 5768534, at *4 (D. Nev. Sept. 29, 2015) (parent company privilege)); *id.* (citing *Buck v. Viking Holding*

28   *Mgmt. Co. LLC*, No. N20C-08-249 AML (CCLD), 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021) (affiliate privilege).  The Court will refer to the parent company privilege.

First, Plaintiff alleges that Defendant acted improperly before it acquired Romeo on October 14, 2022 – at a time when there would be no parent company privilege. *See, e.g.*, *id.* ¶ 23 ("Romeo's sudden refusal in May 2022 to honor the Ceiling Price and its contractual obligations to Lion was orchestrated by Nikola. Indeed, according to Nikola's Form S-4 Registration Statement as filed with the SEC on August 29, 2022, in May 2022, Nikola had become increasingly concerned about Romeo's ability to consistently deliver battery modules and packs to Nikola."); *id.* ¶ 28 ("A few days after [the August 29, 2022] public announcement, and at Nikola's instruction, rather than claiming that the increase in prices prevented Romeo from performing under the Purchase Agreement, Romeo instead claimed that it could not supply the Battery Packs due to alleged 'technical difficulties.'"); *id.* ¶ 29 ("To continue the scheme begun in May 2022, Romeo, on instruction from Nikola, employed the "technical difficulties" excuse from August 2022 onwards. Indeed, in an email from Ms. Webb dated August 12, 2022, Romeo, for the first time, informed Lion of irregular results in safety testing. For that reason, Romeo alleged that it could not build the Battery Packs scheduled for shipment on September 7, 2022."). Plaintiff also alleges that Romeo breached the Agreement before the acquisition. *Id.* ¶ 30 ("In an email dated October 4, 2022 from Ms. Webb, Romeo maintained its inability to deliver the promised Battery Packs because of alleged vibration test failures, and thus rejected both purchase orders, in violation of the terms of the Purchase Agreement. Romeo thus did not build any of the 296 Battery Packs ordered by Lion."). Defendant does not argue – or cite case law suggesting – that the parent company privilege applies to conduct of a prospective parent before acquisition.

Second, even with respect to alleged tortious events that occurred after Defendant acquired Romeo, Defendant cites no Arizona case that has recognized the parent company privilege. And as Plaintiff notes, Arizona cases have declined to apply concepts of privilege in evaluating intentional inference claims, focusing instead on whether the defendant's conduct was improper. *See Wagenseller*, 710 P.2d at 1043 ("We concur in the Restatement's rejection of the formalistic privilege concept in favor of a requirement that

an interference be 'improper' for liability to attach."); *Safeway Ins. Co., Inc. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005) ("In tortious interference cases . . . this Court long ago rejected the 'formalistic privilege concept[.]'").  Defendant's citation to the law of various other states is not persuasive in light of this clear Arizona authority.

As Plaintiff notes, the Arizona Supreme Court adopted the approach in Restatement (Second) of Torts, §§ 766-67 as the proper method for evaluating tortious interference claims.  *See Wagenseller*, 710 P.2d at 1043.  Defendant argues that this approach is not inconsistent with application of the parent company privilege, noting that some states have applied both the Restatement and the privilege.  Doc. 30 at 5.  But the Arizona Supreme Court expressly stated that the Restatement factors were to be used instead of applying a privilege: "We believe the Restatement approach most accurately reflects the tort of interference with contractual relations as it exists today.  We concur in the Restatement's rejection of the formalistic privilege concept in favor of a requirement that an interference be 'improper' for liability to attach." *Wagenseller*, 710 P.2d at 1043.

Plaintiff contends in its reply brief that Defendant's claims should be dismissed even under the Restatement factors.  Doc. 30 at 5-6.  Defendant argues that Plaintiff's response fails to address all of the relevant Restatement factors, but Plaintiff was not required to address those factors because Defendant did not argue in its motion that Plaintiff's claims failed the Restatement test – it relied solely on its argument of privilege.  The Court will not consider an argument made for the first time in Defendant's reply brief.

Finally, Defendant appears to argue that the conduct alleged by Plaintiff was not improper because it advanced Defendant's economic interests.  *See* Doc. 26 at 8.  But a "Defendant's conduct may have been tortious even if it was self-interested."  *Two Bros. Distrib. Inc. v. Valero Mktg. & Supply Co.*, No. CV-15-01509-PHX-DGC, 2015 WL 7567487, at *5 (D. Ariz. Nov. 25, 2015); *see also Wells Fargo*, 38 P.3d at 33-34 ("[S]elf-interest does not justify an affirmative strategy to deprive the Funds of information which the Bank knows is vital to the Funds' legitimate expectations under the Permanent Commitment.") (citation omitted).

The Court will not dismiss Plaintiff's tortious interference with contract claim.

**C.     Tortious Interference with Business Expectancy.**

A claim for tortious interference with business expectancy includes the following elements: (1) the existence of a valid business expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Antwerp Diamond Exch. of Am., Inc. v. Better*, 637 P.2d 733, 740 (Ariz. 1981) (citations omitted).

The interference must also be improper as to motive or means. *Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005); *see also Hill v. Peterson*, 35 P.3d 417, 420 (Ariz. Ct. App. 2001). "A competitor does not act improperly if his purpose at least in part is to advance his own economic interests." *Miller*, 104 P.3d at 202. And the "mere inducement" of a competitor to discontinue a relationship with another "is not actionable 'unless the purpose of the actor was solely to produce damage, or unless the means employed were dishonest or unfair.'" *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 4514934, at *3 (D. Ariz. Jan. 24, 2020) (quoting *Ulan v. Vend-A-Coin, Inc.*, 558 P.2d 741, 745 (Ariz. Ct. App. 1976)).

Defendant argues that Plaintiff fails to allege improper interference because the competition privilege protects Defendant's actions. Doc. 26 at 12-14. As both parties appear to agree, however, the privilege can be overcome if a defendant employed means that were dishonest or unfair. *See, e.g.*, *ReBath LLC v. HD Solutions LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 4514934, at *4 (D. Ariz. Jan. 24, 2020) (stating that where a plaintiff brings a claim for tortious interference with business expectancies, the competition privilege will bar such an action "unless [the plaintiff] can show the purpose of [the] conduct was 'solely to produce damage, or … the means employed were dishonest or unfair.") (quoting *Ulan v. Vend-A-Coin, Inc.*, 558 P.2d 741, 745 (Ariz. Ct. App. 1976)); *see also* Doc. 30 at 8 (Defendant's reply brief accepting this standard).

Plaintiff contends that is has sufficiently alleged that Defendant employed dishonest and unfair means, and the Court agrees. Plaintiff alleges, for example, that Defendant wrongfully interfered with the Purchase Agreement and its business relationship with Romeo. *See, e.g.*, Doc. No. 1 at ¶¶ 52-56. Plaintiff alleges that Defendant did this by improperly causing Romeo to offer, in bad faith, unjustified and false excuses for its nonperformance under the contract. *See id.* at ¶¶ 23, 28-29, 34, 57-62. Plaintiff further alleges that Defendant used the results of its dishonest interference – the inability of Lion to acquire the Battery Packs it needed to manufacture the Lion 8T – as leverage in its attempt to lure away Plaintiff's Lion 8T customers. *See id.* at ¶¶ 38-39, 59-61. These allegations of deceptive tactics sufficiently state a claim based on dishonest or unfair means.

Further, the complaint alleges that Defendant acted with an unfair motive – "to ensure that Romeo would only supply battery modules and packs to [Defendant], thereby preventing [Plaintiff] Lion . . . from fulfilling the Lion Vehicle Orders and other future orders." *Id.* ¶ 49; *see also id.* ¶ 61 ("Nikola knew that its conduct would leave Lion without an alternative source from which to obtain battery packs for the Lion 8T to fulfill the Lion Vehicle Orders and other future orders. Nikola has also harmed Lion's ability to fairly compete with Nikola and other electric vehicle manufacturers."). Courts have found similar allegations sufficient to state a claim. *See, e.g.*, *Mobile v. GlobalGuruTech LLC*, No. CV-22-01950-PHX-SMB, 2023 WL 3998459, at *3 (D. Ariz. June 14, 2023) ("The Complaint alleges that Xfinity has current and prospective business relationships with customers who purchase Xfinity mobile phones and its wireless service. The Complaint also alleges that GGT knew of these relationships with Xfinity customers, and GGT has been intentionally interfering with those relationships by affecting the supply of [Xfinity] Phones and sowing discontent in Xfinity Mobile customers whose accounts were subjected to fraudulent activations and unauthorized . . . orders by [GGT]."); *Sunshine Media Grp., Inc. v. Goldberg*, No. CV-10-0761-PHX-DGC, 2010 WL 2899081, at *8 (D. Ariz. July 22, 2010) ("[T]he complaint asserts that Goldberg directly contacted 96 entities with which

Plaintiffs allege they had a business relationship. . . . Because the complaint sufficiently alleges that Goldberg's alleged conduct was improper, Plaintiffs have stated a claim against Goldberg for intentional interference with business relations.").

Defendant also argues that Plaintiff does not identify any third parties with which Plaintiff had a business expectancy that Defendant disrupted. *Id.* at 13-14.  But the complaint includes allegations about Plaintiff's Lion8T customers. *See, e.g.*, Doc. 1 ¶ 13 ("The Purchase Agreement was indeed crucial to Lion's own commitments towards future purchases of the Lion8T by its customers.  Production and customer deliveries of the Lion8T were planned for the fourth quarter of 2022 and depended on timely delivery of the Battery Packs."); *id.* ¶ 31 ("Lion's deliveries of the Lion8T were put at significant risk as a result of these actions.").  The complaint alleges that Plaintiff had more than 100 orders for the Lion 8T, the vehicle Plaintiff designed to accommodate Romeo's batteries, that could not be fulfilled because of Defendant's improper interference. *See, e.g.*, Doc. 1 ¶¶ 12-13, 38, 55, 61.  The complaint also alleges that Defendant contacted these customers in its attempt to use the results of its improper interference to drive customers away from Plaintiff. *Id.* ¶¶ 39, 60.  And it alleges that Plaintiff suffered damages from being unable to fulfill orders. *Id.* ¶¶ 38, 55-56.  Plaintiff undoubtedly kept business records of the Lion8T customers, so this group of customers should be readily identifiable.  As a result, the complaint shows more than a "mere hope" of a business expectancy. *Dube v. Likins*, 167 P.3d 93, 99 (Ariz. Ct. App. 2007).

The Court will not dismiss the interference with business expectancy claim.

**III.    Motion to Stay.**

This month, Plaintiff and Romeo will participate in a final arbitration hearing. Doc. 11 at 1.  A decision is expected by September 22, 2023. *Id.* at 2.  Defendant urges the Court to stay this litigation because the arbitration will clarify "(i) whether Romeo breached the parties' Agreement, and (ii) whether and to what extent, if any, the alleged breach harmed Lion and its relationship with its own customers." *Id.* at 2.

1   Plaintiff's claims do not depend on Romeo having actually breached the Agreement.

2   *Cellco P'ship v. Hope*, No. CV11-0432-PHX-DGC, 2011 WL 1792741, at *7 (D. Ariz.

3   May 11, 2011), *aff'd*, 469 F. App'x 575 (9th Cir. 2012) ("Arizona courts have cited § 766A

4   of the Restatement as good law. . . .  Section § 766A recognizes liability for a defendant's

5   interference which makes a plaintiff's performance of its own contract more burdensome

6   or expensive."); *Carey v. Maricopa Cnty.*, No. CV-05-2500-PHX-ROS, 2009 WL 750220,

7   at *8 (D. Ariz. Mar. 10, 2009) ("[S]ection 766A does not require that the alleged interfering

8   act actually have the effect of terminating the contract in and of itself."); *Elizabeth M. Ent.*

9   *L.L.C. v. Whitcomb*, No. 1 CA-CV 19-0036, 2020 WL 428653, at *3 (Ariz. Ct. App.

10  Jan. 28, 2020) (citing *Plattner v. State Farm Mut. Auto. Ins. Co.*, 812 P.2d 1129, 1134

11  (Ariz. Ct. App. 1991) ("Interference need not cause an actual breach; liability may exist if

12  the defendant causes a party's performance under the subject contract to be more expensive

13  or burdensome.").

14  The Court therefore sees no point in staying this litigation, will deny Defendant's

15  motion to stay, and hold a case management conference after September 22, 2023.

16  *Rappaport v. Fed. Sav. Bank*, 341 F. Supp. 3d 1039, 1047 (D. Ariz. 2018) ("Whether a stay

17  should be granted for non-arbitrating parties is a decision left to the district court as a matter

18  of its discretion to control its docket.").

19  **IT IS ORDERED**:

20  1.      Defendant's motion to dismiss (Doc. 26) is **denied**.

21  2.      Defendant's motion to stay (Doc. 11) is **denied**.

22  3.      The Court will set a case management conference by separate order.

23  Dated this 14th day of August, 2023.

David G. Campbell
Senior United States District Judge