| | |
|---|---|
| J. Steven Sparks<br>**SANDERS & PARKS, P.C.**<br>3030 North Third Street, Suite 1300<br>Phoenix, AZ 85012<br>Telephone: 602-532-5769<br>steve.sparks@sanderssparks.com | Dennis I. Wilenchik<br>**WILECNHIK & BARTNESS P.C.**<br>2810 North Third Street<br>Phoenix, AZ 85004<br>Telephone: 602-606-2810<br>admin@wb-law.com |
| Colm Moran (*pro hac vice*)<br>Robert E. Feyder (*pro hac vice*)<br>Adam Lauridsen (*pro hac vice*)<br>**SHOOK, HARDY & BACON L.L.P.**<br>2049 Century Park East, Suite 3000<br>Los Angeles, CA 90067<br>Telephone: 424-285-8330<br>cmoran@shb.com<br>rfeyder@shb.com<br>alauridsen@shb.com | Gabor Balassa (*pro hac vice*)<br>Madelyn A. Morris (*pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: 312-862-2000<br>gbalassa@kirkland.com<br>madelyn.morris@kirkland.com<br><br>*Counsel for Defendant*<br>*Nikola Corporation* |
| *Counsel for Plaintiff*<br>*The Lion Electric Company* | |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| The Lion Electric Company, a Canadian corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>Nikola Corporation, a Delaware corporation,<br><br>　　　　　Defendant. | Case No. 2:23-cv-00372-PHX-DGC<br><br>**ESI PROTOCOL** |

Plaintiff The Lion Electric Company ("Plaintiff") and Defendant Nikola Corporation ("Defendant") (collectively, the "Parties"), by and through their attorneys of record, have conferred regarding the production of electronically stored information ("ESI") in their possession, custody, or control, agree to the following, and respectfully move the Court to enter an Order approving the same.

I. **<u>GENERAL</u>**

A. As used herein, "Requesting Party" means the party requesting production of documents. As used herein, "Producing Party" means the party that may be producing documents in response to the request of Requesting party. As used herein, the words "Party" or "Parties" include the Requesting Party and the Producing Party.

B. This Protocol applies to the ESI provisions of Federal Rules Civil Procedure 16, 26, 33, 34, and 37. Insofar as it relates to ESI, this Protocol also applies to Rule 45, if agreed to by the recipient of any document request issued pursuant to that rule, in all instances in which the provisions of Rule 45 are the same as, or substantially similar to, the provisions of Rules 16, 26, 33, 34, and 37. Nothing contained herein modifies Fed. R. Civ. P. 45 and, specifically, the provision of Rule 45(d)(2)(B) regarding the effect of a written objection to inspection or copying of any or all of the designated materials or premises.

C. The Parties agree that this Protocol will serve as a guideline for any document request issued to a Producing Party in this matter. Nothing in this Protocol shall be deemed to prevent any Parties from agreeing to terms different than or inconsistent with the terms of this Protocol.

D. Nothing in this protocol shall be deemed to constitute a waiver of any objections a Producing Party may have with respect to any document request.

E. Nothing in this Protocol shall be deemed to prevent a Party from seeking the Court's intervention with respect to any issues that may arise regarding the application of this Protocol to a document request issued to Producing Party and/or any objections Producing Party may have with respect to any such request if the Parties are unable to resolve any such issues or objections without the Court's assistance. Likewise, nothing in this Protocol shall be deemed to prevent any other Party from opposing relief sought from the Court.

F. To the extent documents or information, including, but not limited to, written responses, ESI, metadata, load files, and accompanying text files, from the ICC Arbitration, Case No. 27332/PDP, Between The Lion Electric Company and Romeo Systems, Inc., are produced in this litigation, they may be identified and re-produced in the same method and format in which they were previously provided in that arbitration.

II. **<u>SCOPE OF ESI</u>**

A. This ordered ESI Protocol is consistent with Rule 26(b)(1) and limits the scope of discovery to discovery regarding any non-privileged data that is relevant to any Party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the Parties' relative access to relevant information, the Parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

B. Data Sources do not include ESI outside the possession, custody, and/or control of the Producing Party.

C. Data Sources do not include discovery regarding ESI that is not reasonably accessible.

1. One example of not reasonably accessible data includes Orphaned Data; which may include unknown or unindexed orphaned data which could be unknown or unindexed materials retained in tape, floppy disk, optical disk, or similar formats primarily for back-up or disaster recovery purposes as well as archives stored on computer servers, external hard drives, notebooks, or personal computer hard drives that are not used in the ordinary course of a party's business operations (e.g. archives created for disaster recovery purposes).

2. Accordingly, the following categories of ESI deemed not reasonably accessible or outside the scope of permissible discovery and therefore need not be preserved by the Parties:

   a. Data stored in a backup system for the purpose of system recovery or information restoration, including but not limited to, disaster recovery backup tapes, continuity of operations systems, data or system mirrors or shadows unless it is the only known source of potentially relevant data;

   b. Information deemed as junk and/or irrelevant ESI outside the scope of permissible discovery in this or other matters;

   c. Server, system, or network logs, electronic data temporarily stored by scientific equipment or attached devices;

   d. Documents collected from custodians that cannot be processed with known or available processing tools;

   e. ESI sent to or from mobile devices provided a copy of that data is routinely saved elsewhere; and

   f. Data stored on photocopiers, scanners, and fax machines.

3. Nothing in this order shall require a party to preserve data that is routinely deleted or over-written in accordance with an established routine records management information governance or system maintenance practice.

4. Nothing in this order shall relieve a party from their obligation to preserve data sources accessed in the ordinary course of business.

D. Nothing in this protocol shall obligate a Party to preserve ESI outside the scope of permissible discovery under Rule 26(b)(1).

III. **SEARCH METHODOLOGY**

A. The Parties will meet-and-confer to discuss and attempt to reach an agreement on the appropriate scope and limitations of production of ESI in conjunction with written discovery requests. The Parties will discuss possible options for ensuring an efficient discovery process, such as the possible use of search terms or technology assisted review, the possible use of testing and sampling, relevant date ranges, possible custodians that may have potentially discoverable information, any obstacles to accessing and producing ESI, and the timing of productions. This section governs materials that have been collected for processing and review.

B. The Parties may employ an electronic search to locate potentially relevant electronic documents. The Producing Party may use a reasonable electronic search of the electronic documents so long as such searches meet the standard of care promulgated in FRCP 26(g).

C. The Parties recognize the intrinsic value of available tools to expedite review and minimize the expenses associated with eDiscovery. These tools include, but are not limited to, limiting the scope of the electronic search (through the use of search terms, cull terms, time frames, fields, document types, and custodian limitations), predictive coding, technology-assisted review ("TAR"), de-duplication and near de-duplication, e-mail threading, date restrictions, and domain analyses. The Producing Party may deploy these tools and technological methodologies to speed up document review, including global de-duplication within their own productions, using near de-duplication technology, predictive coding and computer assisted review. Producing Parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information.

D. Subject to the limitation in Paragraph III.C., the Parties will discuss and attempt to reach an agreement on search methodologies with the goal of limiting the scope of review for production, minimizing the need for motion practice, and facilitating production in accordance with the deadlines set by the Court or agreed upon by the Parties. Agreement on a search methodology does not relieve a Party of its obligations under the Federal Rules to conduct a reasonable search and produce all known relevant and responsive documents of which it is aware. The Parties agree that there may be certain categories of relevant ESI that may not require automated searches. Nothing herein waives a Party's ability to object under Rule 34.

E. <u>Keyword Search Terms</u>.

  1. If used, prior to implementing search terms against collected ESI, the Producing Party will provide a list of proposed search terms to the Requesting Party.

  2. The Parties will meet and confer regarding any additional terms proposed by the Requesting Party.

  3. If there is no dispute as to the terms, the Producing Party may proceed. If the Parties are unable to resolve any disputes over search terms through the meet and confer process (which may include statistical sampling of disputed terms), the Parties will submit the dispute to the Court in the form of a joint discovery letter with a discussion of the relevance and/or burden associated with the search

terms in dispute, in accordance with the Court's Case Management Order, dated October 18, 2023.

F. <u>Technology Assisted Review</u>.

1. If used, prior to using predictive coding/technology-assisted-review for the purpose of identifying or culling the documents to be reviewed or produced, or deciding not to use such technology, the Producing Party will notify the Requesting Party with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies or alternatives.

2. While no specific benchmarks or stabilization percentages are agreed to by the parties undertaking TAR processes, it is agreed that the Producing Party has an obligation to make their best efforts to ensure that the process meets a Rule 26(g) standard.

G. <u>Deficiency Procedure</u>. If the Requesting Party has good cause to believe that a Producing Party's discovery efforts have been deficient, the Parties will meet and confer with the goal of identifying a means by which the Producing Party can provide assurances of the reasonableness of its discovery efforts.

1. As used in this section, "good cause" requires more than mere speculation; the Requesting Party must offer some concrete evidence of a deficiency in the Producing Party's discovery process.

2. The Parties will consider appropriate means to assess the reasonableness of a Producing Party's discovery efforts, including, but not limited to, one or more of the following:

    a. The Producing Party providing high-level process descriptions demonstrative of the quality controls employed as part of its preservation, collection and review efforts.

    b. The Producing Party conducting a quality control evaluation of its responsiveness review process.

    c. If technology-assisted review was employed, the Producing Party disclosing the particular application used.

    d. If search terms were used to identify responsive documents, the Producing Party providing the search terms used and considering reasonable requests for additional search terms proposed by the Requesting Party.

    e. If technology-assisted review was employed, a high level description of the sampling/testing procedure to validate the search method.

3. If the Parties are unable to agree upon a means by which the Producing Party can provide assurances of the reasonableness of its discovery efforts, the Parties

will submit the dispute to the Court in the form of a joint discovery letter, in accordance with the Court's Case Management Order, dated October 18, 2023.

H. A Producing Party may also utilize search methodology to identify and redact certain documents and page ranges that otherwise require HIPAA redactions, redactions of personally protected information (e.g. tax identification numbers or materials that would permit identity theft) or redactions pursuant to 21 C.F.R. § 314.430(e) and 21 C.F.R. § 20.63(f) for documents produced.

I. If a Party contends that the production of materials sought from one or more sources are outside the scope of Rule 26(b)(1), the Parties agree, if necessary, to meet and confer to attempt to resolve the issue. Nothing in this Protocol shall prevent a party from seeking the Court's intervention with respect to any such issue if the Parties are unable to resolve it themselves or from preventing any other Party from opposing any relief sought.

IV. **TIMING OF DISCOVERY**

Discovery of documents shall proceed in the following fashion:

A. After receiving requests for document production and upon reaching agreement regarding the scope, the Parties shall search and review their documents and produce responsive electronic documents on a rolling basis, until such production is complete.

B. The Parties will meet and confer as needed regarding production status.

V. **FORMAT OF PRODUCTION**

The parties will produce ESI in accordance with the following protocol:

A. Non-Database ESI.

1. All non-database ESI shall be produced in TIFF format, subject to section V.B.1, below. All TIFF formatted documents will be single page, black and white, Group 4 TIFF at 300 X 300 dpi resolution and $8\frac{1}{2}$ X 11 inch page size, except for documents requiring different resolution or page size. Logically unitized document-level PDF may also be acceptable subject to the Parties meeting and conferring and agreeing, provided that agreed upon metadata fields (see paragraph V.A.8), if they exist, and associated extracted text (see paragraph V.A.4) are included in the production.

2. A unitization file, in standard format (*e.g.*, Opticon, Summation DII) showing the Bates number of each page, the appropriate unitization of the documents and the entire family range, will accompany each TIFF document.

3. A delimited text file that contains agreed upon metadata fields (see paragraph V.A.8), if those fields exist and are reasonably accessible, and associated extracted (or OCR for paper-based or redacted documents) text (see paragraph V.A.4) should also be produced and use the following delimiters:

   Field Separator, ASCII character 020: """"

Quote Character, ASCII character 254 "þ"
Multi-Entry Delimiter, ASCII character 059: ";"

If the Producing Party requests alternate delimiters, the Parties shall agree on alternate delimiters.

4. Extracted, searchable full text will be produced for each non-redacted electronic document having extractable text. Each extracted full text file will be named according to the first Bates number of the corresponding electronic document.

5. Each TIFF or .TIF version of an unredacted electronic document will be created directly from the corresponding native file.

6. <u>Unredacted spreadsheets</u>.

    a. All unredacted spreadsheets should be produced in their native format and in the order that they were stored in the ordinary course of business, i.e. emails that attach spreadsheets should not be separated from each other and should be linked using the Attachment Range fields.

    b. The file name should match the Bates number assigned to the file.

    c. The extractable metadata and text should be produced in the same manner as other documents that originated in electronic form.

    d. A slipsheet with the words "File Produced Natively" with Bates number and Confidentiality designation shall be placed to mark where the original Native file was found in the normal course.

    e. The Parties agree to work out a future protocol governing the use and format of documents produced pursuant to paragraph V.A.6 at trial, depositions or hearings (such as converting to tiff images in accordance with paragraphs V.A.1-5).

7. <u>Redacted spreadsheets</u>.

    a. For redacted spreadsheet files (*e.g.*, Microsoft Excel), TIFF or .TIF versions, if produced, shall include all hidden rows, cells, worksheets as well as any headers or footers associated with the spreadsheet file.

    b. A Party may elect to produce spreadsheet files as native rather than image files. In the event that a Producing Party has native redaction capability or seeks to remove a column or row from a spreadsheet for redaction purposes, the Producing Party will identify the natively redacted spreadsheet as redacted in the associated "Redacted" field.

8. <u>Metadata</u>.

    a. The following metadata fields associated with each electronic document will be produced, to the extent they exist as electronic metadata

associated with the original electronic documents and are reasonably accessible using industry standard tools. No Party will have the obligation to manually generate information to populate these fields.

b. The following fields will be produced by the Parties:

| FIELD | FORMAT | DESCRIPTION |
|---|---|---|
| BEGDOC | Fixed-Length Text | Beginning Bates number |
| ENDDOC | Fixed-Length Text | Ending Bates number |
| BEGATTACH | Fixed-Length Text | Beginning of family range, first number of first family member |
| ENDATTACH | Fixed-Length Text | End of family range, last number of last family member |
| CUSTODIAN | Multiple Choice | Custodian name |
| ALL CUSTODIANS | Multiple Choice | If global deduplication is used, this field will be populated with the custodians who also had a copy of this document or document family, but which is not being produced because of deduplication. |
| DATE_CREATION | Date (date:time) | Creation Date File System |
| DATESENT | Date (date:time) | Sent Date for email |
| Date Received | Date (date:time) | Received Date for email |
| DATELASTMOD | Date (date:time) | Last Modified File System |
| FILEEXT | Fixed-Length Text | File Extension |
| FILENAME | Fixed-Length Text | File Name (efiles) |
| File Size | Number Field | File size (in bytes, kilobytes, or megabytes) |
| HASHVALUE | Fixed-Length Text | Algorithmic based Hash Value generated by accepted method such as MD5 or SHA1 (or CONTROL_ID for scanned paper) |
| Original File Path | Long Text | Location where the document was kept in the normal course of business |

| | | |
|---|---|---|
| Email Folder Path | Long Text | Location where the email was kept in the normal course of business |
| FILEPATH | Fixed-Length Text | Relative Path to any natively produced documents |
| BCC | Long Text | BCC Recipient Combined |
| CC | Long Text | CC Recipient Combined |
| FROM | Fixed-Length Text | Sender Combined |
| SUBJECT | Fixed-Length Text | Subject |
| TO | Long Text | Recipient Combined |
| PAGECOUNT | Whole Number | Page count, except any file produced natively will have a page count of 1 |
| CONFIDENTIALITY | Fixed-Length Text | Confidentiality |
| Redacted | Yes or No | Indicates whether the file has been redacted |
| Conversation Index | Fixed-Length Text | The conversation index value for email (e.g. MS Exchange message id) |
| Embedded | Yes or No | File embedded in native file |
| TEXTPATH | Fixed-Length Text | Relative path to the produced text file |

   c. The Parties agree that system metadata dates may or may not be accurate, but Parties will do their best to preserve accuracy of system metadata (e.g. forensics are not required).

   d. A Producing Party may withhold metadata fields for redacted documents.

9. Embedded Files.

   a. If a document has another responsive file embedded in it, (*e.g.*, PowerPoint with a spreadsheet in it), the Producing Party may, when possible, extract and produce the documents as a separate document and treat such documents as attachments to the document.

   b. The Requesting Party may request that the embedded file be produced as a standalone file, if possible.

B. Native Files.

1. The Parties agree that documents will be produced in the imaged format as set forth in paragraph V.A and that no Requesting Party may request or seek to compel the production of ESI in native format on a wholesale basis, with the exception of spreadsheets as detailed in paragraphs V.A.6 and 7.

2. Subsequent to the production of the imaged documents, however, and according to the following protocol, a Requesting Party may request for good cause from a Producing Party that certain imaged files be produced in native format because the files are not reasonably usable in an imaged form.

    a. The Requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in native file format.

    b. The Producing Party shall have a reasonable timeframe to produce those native files previously identified as not reasonably usable, or it may object to the demand as unreasonable as follows:

        i. Within 10 days of receiving a request to produce native files, the Producing Party will respond in writing, setting forth its objection(s) to the production of the files natively.

        ii. The Parties will meet and confer regarding the request and corresponding objection(s), and if the Parties are unable to agree as to the production of such files in native format within 10 days of submission of the Responding Party's objection(s), the Parties will submit the matter to the Court.

    c. Any produced native files will be assigned a unique file name and hash value and will include a cross reference to the Bates number it was originally produced with.

C. <u>Production of Documents Collected as Paper</u>. For documents that have been collected in paper format, the same specifications should be used as the production of ESI in paragraph V.A with the following clarifications:

1. A delimited text file that contains available fielded data should also be included and at a minimum include Beginning Bates Number, Ending Bates Number, Custodian and Number of Pages.

2. To the extent that documents have been run through an Optical Character Recognition (OCR) Software in the course of reviewing the documents for production, full text should also be delivered for each document. Text should be delivered on a document level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document.

3. A text cross reference load file should also be included with the production delivery that lists the beginning Bates number of the document and the relative path to the text file for that document on the production media.

    4.    A Producing Party will make best efforts to unitize documents collected as paper prior to scanning. However, the Parties agree that legacy scanned documents in electronic form scanned prior to this litigation will be unitized as they are collected in the ordinary course of business.

D. <u>Production of Databases and Other Structured Data</u>.

    1.    Generally, relevant ESI stored in databases should be produced in a mutually agreeable data exchange format.

    2.    The Parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured data source. If ESI in commercial or proprietary database format can be produced in an already existing and reasonably available report form, the Parties will produce the information in such a report form, in the reasonably usable TIFF-image format described in paragraph V.A. If an existing report form is not reasonably available, the Parties will meet and confer to attempt to identify a mutually agreeable report form.

    3.    Nothing herein shall obligate a Producing Party to create custom reporting. The Parties shall meet and confer to discuss the associated cost and proportionality of any custom reporting should this be contemplated.

E. <u>Other</u>. The Parties share a desire to ensure that ESI is produced in an acceptable, searchable format. The Parties recognize that certain, limited ESI may not be amenable to the proposed technical specifications. The Parties will meet and confer in good faith to reach agreement regarding these issues and the appropriate form of production, and will seek Court intervention if necessary.

## VI. DE-DUPLICATION

A. <u>De-Duplication and Near De-Duplication</u>.

    1.    Parties may de-duplicate globally. If Parties de-duplicate globally, it is agreed that for each production, an updated metadata overlay file will be produced with "All Custodians" data provided as detailed in paragraph V.A.8.b.

    2.    The Parties agree that an e-mail that includes content in the "bcc" or other blind copy field shall not be treated as a duplicate of an otherwise identical e-mail that does not include content in the "bcc" or other blind copy field.

    3.    The Parties also agree that the use of near-de-duplication protocols can reduce the cost of the review and production of ESI.

    4.    A Party may also de-duplicate "near duplicate" email threads as follows:

        a.    In an email thread, only the final-in-time document need be produced, provided that:

      i. All previous emails in the thread are contained within the final message.

      ii. The software used to identify these "near-duplicate" threads is able to identify any differences to the thread such as changes in recipients (e.g., side threads, subject line changes), dates, selective deletion of previous thread content by sender, etc. To the extent such differences exist, documents with such differences shall be produced.

      iii. Where a prior email contains an attachment, that email and attachment shall not be removed as a "near-duplicate."

5. To the extent that deduplication is used, the Parties expressly agree that a document produced from one custodian's file but not produced from another custodian's file as a result of deduplication will nonetheless be deemed as if produced from that other custodian's file for purposes of deposition, interrogatory, request to admit and/or trial.

B. <u>E-mail Threads & Attachments</u>.

1. Producing Party may produce non-inclusive e-mail solely as part of an inclusive e-mail thread, even though such e-mail were transmitted by themselves or as part of another non-inclusive e-mail thread, provided that any otherwise duplicate e-mail thread having a previous e-mail in the thread deleted or modified will be identified as a separate inclusive e-mail.

2. Requesting Party agrees that Producing Party may produce only inclusive e-mail items, provided that:

    a. Producing Party will make reasonable efforts to correct any errors that occur as part of its efforts to produce e-mail chains, as described above, including but not limited to incomplete production of attachments.

    b. If any issues arise from Producing Party's production of only inclusive e-mail items, even if not strictly production "errors," Producing Party and the Requesting Party will meet and confer in good faith to resolve or address such issues.

## VII. PRIVILEGE AND REDACTIONS

A. <u>Privileged Information and Attorney Work Product</u>. Electronic documents that contain privileged information or attorney work product shall be returned or destroyed if they reasonably appear to have been produced, inadvertently or otherwise, or if there is notice of the inadvertent production, in accordance with the Parties' 502(d) Order, dated November 17, 2023. The Parties will meet and confer to the extent there is a disagreement on the privileged nature of the document. Otherwise, all copies shall be returned or destroyed by the Requesting Party. To the extent that there is a conflict of

law in regards to the Requesting Party's obligation to return or destroy privileged documents, the law most favorable to the inadvertent Producing Party shall apply. Nothing herein will prevent a receiving Party's right to object to the privileged nature of the document.

B. <u>Redactions</u>.

1. The Parties need not log redacted documents on a privilege log. The privilege designation will be available on the face of the document. A Requesting Party may request at any time that a redacted document be logged on a privilege log. Upon such a request, the producing party must produce a privilege log containing the at-issue redacted documents.

2. A Producing Party may redact ESI that the Producing Party claims is subject to attorney client privilege, work product protection, contains information that relates to other products, or any ESI for which there is a legal prohibition against disclosure.

3. The Producing Party shall mark each redaction with the bases for each redaction (e.g., PII, privilege).

4. The Producing Party shall preserve an un-redacted version of the item.

C. <u>Claims of Privilege and Privilege Log</u>.

1. The Producing Party must furnish a log of all documents withheld from production on the basis of attorney-client or work-product privilege ("Privilege Log") within sixty (60) days of completion of its final production. To the extent a Producing Party needs more time, the Parties will meet and confer.

2. Consistent with Fed. R. Civ. P. 26(b)(5), the Producing Party's Privilege Log will contain the following information:

    i. Date of document or communication (including month, day, and year)

    ii. Type of document

    iii. Author of document

    iv. Sender of document (if different from author), including email address

    v. Recipient names (including email addresses)

    vi. CC names (including email addresses)

    vii. BCC names (including email addresses)

    viii. Bates range of the privileged documents

    ix. Indication of the privilege

        x.    File name

        xi.    If produced, family member designation within the production

        xii.    A description of the subject matter of the document or communication with information sufficient to demonstrate the existence of a privilege

3. A Party need only log the topmost e-mail in a thread so long as the description of the subject matter includes enough information sufficient to demonstrate the privilege.

4. To the extent a Party seeks to use categorical logs in lieu of providing the information above, the Producing Party will initiate a meet and confer with the Requesting Party. However, documents comprising attorney-client communications and/or attorney work product relating to the litigation and dated after the start of the litigation need not be included on a privilege log.

5. To the extent available, individuals should be identified with enough information to identify why the privilege attaches.

6. If the Requesting Party objects to a document (or part of it) being withheld or redacted as privileged, it shall meet and confer with the Producing Party. Should the Parties not be able to agree to a resolution of the dispute, the Requesting Party shall submit the dispute to the Court.

## VIII. COSTS

The Parties agree that the Producing Party bears the burden of discovery costs absent agreement or court order pursuant to Rule 26(c)(1)(B).

| | |
|---|---|
| Dated: November 17, 2023 | **SANDERS & PARKS, P.C.**<br><br>By: */s/ J. Steven Sparks*<br>    J. Steven Sparks<br><br>**SHOOK HARDY AND BACON, L.L.P.**<br><br>By:  */s/ Adam Lauridsen*<br>    Colm A. Moran (*pro hac vice*)<br>    Robert E. Feyder (*pro hac vice*)<br>    Adam Lauridsen (*pro hac vice*)<br><br>*Counsel for Plaintiff*<br>*The Lion Electric Company* |
| | By:  */s/ Madelyn A. Morris*<br><br>**KIRKLAND & ELLIS LLP**<br>Gabor Balassa (*pro hac vice*)<br>Madelyn A. Morris (*pro hac vice*)<br>300 North LaSalle<br>Chicago, IL 60654<br>gbalassa@kirkland.com<br>madelyn.morris@kirkland.com<br>*Counsel for Defendant*<br>*Nikola Corporation* |